IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

THOMAS PILCHER,                    *
As Administrator of the            *
Estate of Christopher              *
Robert Myers, Deceased,            *
                                   *
        Plaintiff,                 *    CIVIL ACTION NO. 25-00072-KD-B
                                   *
vs.                                *
                                   *
CITY OF FOLEY, ALABAMA,            *
et al.,                            *
                                   *
        Defendants.                *

## REPORT AND RECOMMENDATION

This action is before the Court on the Motion to Dismiss filed by Defendants City of Foley, Alabama, Mayor Ralph Hellmich, Chief Thurston Bullock, Deputy Chief Kevin Carnley, Jail Cmdr. Larry Dearing, Chief Corrections Officer Nicole Phillips, Shift Supervisor Melanie Gouveia, Corrections Officer Dontae Bailey, Shift Supervisor Raven Williams, Corrections Officer John Ash, and Corrections Officer Louis Brower, Jr. (collectively "the Foley Defendants"). (Docs. 24, 25, 26). The motion, which has been fully briefed, has been referred to the undersigned Magistrate Judge for consideration and recommendation pursuant to 28 U.S.C. § 636(b)(1). Upon consideration of all matters presented, the undersigned recommends, for the reasons stated herein, that the Foley Defendants' motion be **GRANTED** as to Plaintiff's federal constitutional claims and **DENIED** as to the remaining state law

claims, as the Court should decline to exercise supplemental jurisdiction over all non-federal claims against the Foley Defendants.

## I.   BACKGROUND.

### A.   Thomas Pilcher's Amended Complaint Allegations

Plaintiff, Thomas Pilcher, as personal representative of the Estate of Christopher Robert Myers, commenced this action after the in-custody death of Christopher Robert Myers on February 27, 2023, in the Foley City Jail ("the jail"). (Doc. 1).

In his operative First Amended Complaint ("the Complaint"), Plaintiff alleges the Foley Defendants[1] caused Myers's death by exhibiting deliberate indifference to a serious medical need in violation of the Fourteenth Amendment to the United States Constitution and by engaging in negligence and wantonness under the state laws of Alabama. (See Doc. 19). Plaintiff contends that upon being booked into the jail, Myers informed the officers that he suffered from heart disease, alcoholism, and high blood pressure. (Id. at ¶ 18). Despite informing the officers that he did not have his high blood pressure medication with him, Myers never received his blood pressure medication, nor was his blood

---

[1] In addition to the Foley Defendants, Plaintiff has also sued Defendants Bay Nursing, Inc., Jail Physician, Jail Nurse Rosi, and 2nd Jail Nurse. (See Doc. 19). Those Defendants, however, are not a party to this motion to dismiss (see Docs. 24, 25, 26), and the claims against them will not be discussed in this report.

pressure checked during booking or any time during the twenty-one hours from his admission to the jail on February 26, 2023, until he was found dead on February 27, 2023. (Id. at ¶ 19). Plaintiff further alleges that upon discovering Myers unresponsive in his cell, no medical assistance or emergency transfer to a hospital took place due to the underfunding and understaffing of the jail, directly contributing to Myers's death. (Id. at ¶¶ 37-43). Plaintiff alleges that all named Defendants "knew or should have known of Mr. Myers chronic medical conditions . . . , and that if inadequately treated or left untreated, Mr. Myers would become gravely ill and in serious medical need for emergency hospitalization and medical treatment but were deliberately indifferent to that need by delaying and denying said emergency hospitalization and treatment to him ultimately leading to his death." (Id. at ¶ 43).

In the Complaint, Plaintiff asserts eleven claims for relief alleging various constitutional violations under 42 U.S.C. § 1983 and negligence and wantonness and wrongful death claims under state law against Mayor Hellmich, Chief Bullock, Deputy Chief Carnley, Jail Cmdr. Dearing, Chief Corrections Officer Phillips, Officer Gouveia, Officer Bailey, Officer Williams, Officer Ash, and Officer Brower (collectively "the Individual Defendants") in their individual and official capacities (id. at ¶¶ 3-7), as well as the City of Foley (id. at ¶ 2). Plaintiff seeks compensatory damages

from all defendants, punitive damages against the defendants in their individual capacities, a declaratory judgment, injunctive relief, attorneys' fees, expenses, costs, pre-judgment interest, post-judgment interest, and "any further relief that this Court deems just and proper." (Id. at 33-34).

**B. Relevant Facts**

The Foley Defendants have moved to dismiss the Complaint. (See Doc. 24). Their motion is based primarily on submitted video camera recordings from the Foley City Jail that capture the entirety of Myers's detention at the jail, including his booking, intake, screening, and all actions that occurred directly outside and inside Myers's cell for the duration of his detainment. (See Docs. 25, 26). Because Plaintiff has not challenged the authenticity of the video recordings (Doc. 26), and because the recordings "clearly depict events that are central to [Plaintiff's] claims," the Court will consider the videos for purposes of the motion to dismiss under the incorporation-by-reference doctrine. See Johnson v. City of Atlanta, 107 F.4th 1292, 1300-01 (11th Cir. 2024) (holding that the district court properly considered camera recordings that were not referred to in or attached to the complaint on a motion to dismiss under the incorporation-by-reference doctrine where the recordings were central to the plaintiff's claims and undisputed, meaning their authenticity was not challenged). Additionally, the Court "constru[es] all

ambiguities in the video footage in favor of plaintiff, just as it must, at this stage, construe in plaintiff's favor all ambiguities in the written pleadings," <u>Cantrell v. McClure</u>, 805 F. App'x 817, 819 n.2 (11th Cir. 2020) (per curiam), but where the video footage clearly contradicts Plaintiff's allegations, the Court will "view[] the facts in the light depicted by the videotape." <u>Scott v. Harris</u>, 550 U.S. 372, 381 (2007).

The relevant facts as presented by the parties or as depicted on the video recordings submitted with the motion to dismiss are as follows:

On the morning of February 26, 2023, Myers was driving to pick up his fiancé and go to church. (Doc. 19 at ¶ 13). At approximately 9:40 a.m., Baldwin County Deputy Nicholas James stopped the vehicle Myers was driving because he noticed the registered owner of the vehicle had an outstanding bench warrant from the municipal court of Elberta, Alabama, for failure to appear in court on a misdemeanor charge. (<u>Id.</u> at ¶ 14). Baldwin County Deputy Jesse Powell arrived at the scene of the stop, and Myers was taken into custody without incident. (<u>Id.</u> at ¶ 15). Neither deputy reported that Myers was intoxicated, that they smelled the odor of alcohol on his breath, that he was behaving like he was intoxicated, or that he was driving erratically. (<u>Id.</u> at ¶ 16). No field sobriety test was conducted, nor was Myers cited for any alcohol-related offense. (<u>Id.</u> at ¶ 17). Myers arrived at the

Foley City Jail around 10:00 a.m., where he was booked into the jail by Defendants Gouveia, Bailey, and Brower. (Id. at ¶¶ 17, 18).

During the booking process, Myers answered questions from Officers Gouveia, Bailey, and Brower. Officer Gouveia, the day shift supervisor, asked Myers his name, address, telephone number, and place of employment, while Officer Bailey searched Myers. (Doc. 26, Exs. 1, 3, & 4 at 10:09:50 AM; Ex. 5 at 10:10:11 AM). During the search, Myers was asked if he was under the influence of anything, and Myers answered, "no," but added, he "drank last night." (Id., Exs. 1 & 5 at 10:11:02 AM). Officer Bailey told Myers, "I smell some on your breath." (Id.). Officer Brower then asked Myers a series of medical screening and history questions, all of which Myers intelligibly answered. (Id., Exs. 1 & 5 at 10:14:39 AM to 10:18:38 AM). Such questions and answers included:

• Was he under the influence of alcohol or narcotics? Myers answered, "Just alcohol last night."
• Did he have thoughts of suicide? Myers answered, "No."
• Did he plan to hurt himself while in the jail? Myers answered, "No."
• Had he ever tried to commit suicide in the past? Myers answered, "No."
• Did Myers suffer from "heart disease, high blood pressure, asthma, diabetes, ulcers, TB, or any infectious disease?" Myers answered that he had ulcers and high blood pressure.

• Did he suffer from any other type of medical, dental, or psychiatric problem? Myers joked, "I've got bad teeth, but who doesn't?"

• Was he currently taking any medications or receiving treatment for any medical or mental problems? Myers answered, "No, just for my high blood pressure."

• Could anyone bring medication to the jail that he might need? Myers answered, "No."

• Did he have any food or drug allergies? Myers answered that he was allergic to milk and cheese.

• Had he undergone any medical, dental, or psychiatric treatment in the last six months? Myers answered, "None."

• Had he experienced any recent fainting spells, blackouts, or withdrawals? Myers answered, "None."

• Was he experiencing "any unusual pain, shortness of breath, or symptoms that we need to be aware of?" Myers answered, "None."

• Had he had any recent head injuries? Myers answered that he had recently recovered from COVID.

• What, if any, drugs Myers used and when he last used them? Myers answered, "I don't use drugs."

(Id., Exs. 1 & 5 at 10:14:39 AM to 10:18:38 AM).

After discussing his bond amount and completing booking procedures, Officer Brower administered a blood alcohol test to Myers. (Id., Exs. 1 & 3 at 10:39:40 AM to 10:40:52 AM). Myers registered a .224 blood alcohol content (BAC) level. (Id., Ex. 1 at 10:40:52 AM). Officer Brower examined a chart on the wall and announced that based on his BAC level, Myers had to wait sixteen hours to sober up before he would be eligible for release. (Id.,

Exs. 1 & 3 at 10:41:20 AM). Myers was told the hold was for his "safety." (Id., Ex. 1 at 10:41:35 AM).

Myers was unable to reach anyone on the jail phone during booking (see id., Ex. 8), but while detained five calls came into the jail regarding Myers.[2] One of the calls was from Myers's brother-in-law, who apparently came to the jail to bail Myers out and called from within a lobby area of the jail. (Id.; Ex. 1 at 2:42:32 PM). During the call, Officer Gouveia explained the requirements for Myers's bond, how to obtain a bondsman, and further explained that Myers was being held until 2:15 a.m. due to his .224 BAC reading. (Id.). In response, Myers's brother-in-law informed Officer Gouveia that Myers was an alcoholic who, the family believed, had been working on his sobriety. (Id.).

After being booked into the jail, Myers was placed in Holding Cell 3 with another inmate. (Id., Ex. 8, Ex. 1 at 10:53:22 AM). Myers, like his cellmates, primarily lied down or slept while in the cell, but he was easily aroused each time the cell door was opened or when spoken to. (Id.; Ex. 2). When moving around his

---

[2] While detained, five phone calls came into the jail regarding Myers. The first call related to the whereabouts of the car Myers was driving when arrested. (Doc. 26, Ex. 1 at 10:55:31 AM). The second and fourth calls were Myers's sister, who was given information of Myers's charge, bond amount, and time eligible for release, as well as a status update. (Id., Ex. 1 at 1:18:06 PM; 2:42:32 PM). The third call was Myers's brother-in-law. (Id., Ex. 1 at 2:42:32 PM). And the final call was from a bondsman, who was informed of Myers's charge, bond amount, and when he would be eligible for release. (Id., Ex. 1 at 2:47:57 PM).

cell, Myers can only be described as normal: standing, walking, sitting, using the toilet, talking to his cellmate, eating, drinking water, etc. (Id., Ex. 2 at 11:51:32 AM to 12:09:31 PM; 1:04:52 to 1:05:02 PM; 3:51:17 to 3:59:51 PM; 4:00:09 to 4:01:20 PM; 6:22:40; 6:22:40 to 6:31:35 PM). Myers used the intercom button in his cell four times to call officers for various needs: (1) he inquired about his arrest warrant; (2) he asked to make another phone call; (3) he requested a cup for water; and (4) he requested toilet paper, and officers responded to each call. (Id., Exs. 1, 2, & 3 at 3:01:38 PM to 3:01:57 PM; 3:13:42 to 3:14:32 PM; 3:51:17 to 3:59:51 PM; 5:02:06 to 5:04:27 PM). Myers's cell door was opened by officers for various reasons at least nine times on February 26th, and at no time did Myers appear in distress, exhibit any medical symptoms, or express a need for medical help or treatment. (Id., Exs. 1 & 2 at 11:37:03 AM; 2:09:51 PM; 3:01:57 PM; 3:39:39 PM; 5:04:27 PM; 8:13:44 PM; 8:37:15 PM; 11:12:39 PM).

While detained in Holding Cell 3, officers conducted sixteen "checks" on Myers by looking through the cell door window and observing Myers. (Id., Exs. 1, 3, & 4 at 11:24:27 AM; 3:08:36 PM; 4:44:00 PM; 5:33:34 PM; 6:54:18 PM; 8:05:10 PM; 8:57:36 PM; 11:46:42 PM; 12:32:51 AM; 1:19:46 AM; 2:50:24 AM; 3:46:38 AM; 4:50:42 AM; 4:50:42 AM; 6:15:34 AM). At no time did Myers appear in distress or act in a manner that was cause for alarm or concern. During each of the cell checks, Myers was lying down, covered with

a blanket, and appeared to be sleeping. (Id., Ex. 2 at 11:24:27
AM; 3:08:36 PM; 4:44:00 PM; 5:33:34 PM; 6:54:18 PM; 8:05:10 PM;
8:57:36 PM; 11:46:42 PM; 12:32:51 AM; 1:19:46 AM; 2:50:24 AM;
3:46:38 AM; 4:50:42 AM; 4:50:42 AM; 6:15:34 AM).

Taking a closer look at the minutes and hours surrounding
Myers's death, the jail video recordings reflect the following
timeline and events:

11:12 PM  Officer Williams removes Myers's cellmate, and Myers,
          who is lying down, looks in the direction of the other
          inmate and watches him leave. (Id., Exs. 1, 2, 3, & 4
          at 11:12:39 PM).

11:46 PM  Officer Ash conducts a cell check, and Myers is lying
          down. (Id., Exs. 1, 3, & 4 at 11:46:42 PM).

11:55 PM  Myers walks to the toilet, walks back to his mat, lays
          back down, and begins snoring. (Id., Ex. 2 at 11:25:45
          PM; 11:55:37 PM to 12:13:24 AM).

12:32 AM  Officer Williams conducts a cell check. (Id., Exs. 1,
          3, & 4 at 12:32:51 AM).

1:14 AM   Myers sits up, drinks a cup of water, lies down on his
          side in a slightly curled position, and begins snoring
          loudly. (Id., Ex. 2 at 1:14:58).

1:19 AM   Officer Williams conducts another cell check. (Id., Exs.
          1, 3, & 4 at 1:19:46 AM).

1:22 AM   Myers stops snoring; Myers tucks his feet up into a
          tightly curled position, then stretches out in a rigid,
          tense manner (causing his blanket to cover his head and
          face, and he begins to make loud, deep breath sounds
          (approximately twelve audible breaths). (Id., Ex. 2 at
          1:22:35 to 1:23:33 AM). Myers does not move from this

position again.  Nor is another audible sound heard from him on the video.  (<u>Id.</u>, Ex. 2 at 1:23:33 to 6:55 AM).

2:50 AM    Officer Ash conducts a one-to-two-second "check" on Myers by looking through the cell door window.  (<u>Id.</u>, Exs. 1, 3, & 4 at 2:50:24 AM).

3:46 AM    Officer Williams conducts a one-to-two-second "check" on Myers by looking through the cell door window.  (<u>Id.</u>, Exs. 1, 3, & 4 at 3:46:38 AM).

4:50 AM    Officer Ash conducts a one-to-two-second "check" on Myers by looking through the cell door window.  (<u>Id.</u>, Exs. 1, 3, & 4 at 4:50:42 AM).

Just before 6:00 a.m., Corrections Officer Haley Deisner reported for duty, and Officers Williams and Ash completed their night shifts and left the jail.  (<u>Id.</u>, Ex. 1 at 5:42:03 and 5:53:02). At 6:15 a.m., a day shift corrections officer conducted a check on Myers by looking through the cell door window, and Myers appeared to be sleeping.  (<u>Id.</u>, Exs. 1, 3, & 4 at 6:15:34 AM).  At 6:55 a.m., Officer Deisner opened Myers's door to awake him, but Myers failed to respond to his name being called.  (<u>Id.</u>, Exs. 1, 2, 3, & 4 at 6:55:36 AM).  Officer Deisner walked to Myers and physically attempted to wake him but found him deceased (<u>id.</u>, Ex. 2 at 6:55:36 AM); his body was "cold and stiff, and rigor mortis had already set in" and "emergency intervention would have been futile." (Doc. 19 at ¶¶ 24, 35).  The autopsy determined that Myers died of "complications of chronic ethanolism," though no alcohol or drugs were detected in Myers's blood at the time of his death.  (Doc.

26, Ex. 9). The autopsy report listed "hypertensive cardiovascular disease" as a contributing factor. (Id.). And the medical examiner ruled the manner of death, "Natural." (Id.).

The Foley Defendants assert the Complaint fails to state a claim and request that judgment as a matter of law be entered in their favor and that they be granted qualified immunity based on the facts confirmed through the submitted jail video recordings. (See Docs. 24, 25, 26). Plaintiff objects to the Foley Defendants' motion to dismiss, arguing it conflates the Rule 12(b) standard and goes beyond the pleading to weigh the facts of the case. (Doc. 31). Plaintiff asserts the motion should be denied because the Complaint contains sufficient allegations at the pleading stage to proceed, specifically that Myers was booked into the Foley City Jail with "well-documented conditions - alcoholism, hypertension, and a heart condition – and displayed obvious symptoms visible to any layperson, including profuse sweating, chest pain, and tremors." (Id. at 3).

As noted by the Foley Defendants (see Doc. 32 at 5), Plaintiff does not identify these "obvious symptoms" in the Complaint (see Doc. 19). These alleged facts do not appear in the Complaint, nor has Plaintiff identified the symptoms of "profuse sweating, chest pain, and tremors" on any jail camera footage. After an exhaustive search, the Court has been unable to identify any such symptoms on any jail camera footage; thus, the Court will not consider, in

resolving the motion to dismiss, Plaintiff's allegation, presented in his response to this motion, that Myers "displayed obvious symptoms visible to any layperson, including profuse sweating, chest pain, and tremors."

## II.  STANDARDS OF REVIEW.

### A. Motion to Dismiss for Lack of Subject Matter Jurisdiction.

Federal courts are courts of limited jurisdiction and are authorized by Constitution and statute to hear only certain types of actions. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). "In a given case, a federal district court must have at least one of three types of subject matter jurisdiction: (1) jurisdiction under a specific statutory grant; (2) federal question jurisdiction pursuant to 28 U.S.C. § 1331; or (3) diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)." Baltin v. Alaron Trading Corp., 128 F.3d 1466, 1469 (11th Cir. 1997).

A party may move to dismiss a complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). A Rule 12(b)(1) challenge to subject matter jurisdiction may take the form of a facial attack or a factual attack on the complaint. Lawrence v. Dunbar, 919 F.2d 1525, 1528-29 (11th Cir. 1990) (per curiam). In a facial attack, the court must simply evaluate whether the complaint alleges a sufficient basis for subject matter jurisdiction, while accepting all factual allegations as true for purposes of the motion. Id. at 1529. In

13

contrast, a factual attack challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings. <u>Id.</u> In a factual challenge to subject matter jurisdiction, the court may consider matters outside the pleadings and weigh conflicting evidence, and no presumption of truthfulness attaches to the plaintiff's allegations. <u>Id.</u>

"If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). Dismissal for lack of subject matter jurisdiction "must be without prejudice." <u>McIntosh v. Royal Caribbean Cruises, Ltd.</u>, 5 F.4th 1309, 1313 (11th Cir. 2021).

**B. Motion to Dismiss for Failure to State a Claim.**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> This necessarily requires that a plaintiff include factual allegations that plausibly support each

essential element of his claim.  Randall v. Scott, 610 F.3d 701, 708 n.2 (11th Cir. 2010).

When evaluating a motion to dismiss under Rule 12(b)(6), a court "must accept the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." Almanza v. United Airlines, Inc., 851 F.3d 1060, 1066 (11th Cir. 2017). That said, "[l]egal conclusions without adequate factual support are entitled to no assumption of truth." Mamani v. Berzaín, 654 F.3d 1148, 1153 (11th Cir. 2011).  A complaint does not need detailed factual allegations, but it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555.  Additionally, "[i]f the complaint contains a claim that is facially subject to an affirmative defense, that claim may be dismissed under Rule 12(b)(6)." LeFrere v. Quezada, 582 F.3d 1260, 1263 (11th Cir. 2009).

A court reviewing a motion to dismiss must typically limit its consideration to the complaint and exhibits attached thereto. Grossman v. Nationsbank, N.A., 225 F.3d 1228, 1231 (11th Cir. 2000) (per curiam).  However, a "court may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged." SFM Holdings, Ltd. v. Banc of Am. Sec., LLC, 600 F.3d 1334, 1337 (11th Cir. 2010); see also Harris v. Ivax Corp., 182 F.3d 799, 802 n.2 (11th Cir. 1999)

(stating that "a document central to the complaint that the defense appends to its motion to dismiss is also properly considered, provided that its contents are not in dispute"). A court can also "consider . . . matters of which a court may take judicial notice" when evaluating a Rule 12(b)(6) motion to dismiss. <u>Tellabs, Inc. v. Makor Issues & Rts., Ltd.</u>, 551 U.S. 308, 322 (2007).

## III. DISCUSSION.

The Complaint contains eleven counts against the Foley Defendants:[3]

| COUNT | CLAIM | DEFENDANTS |
|-------|-------|------------|
| I | Fourteenth Amendment Deliberate Indifference to a Serious Medical Needs | Gouveia, Bailey, Williams, Ash, Brower, City of Foley, Hellmich, Bullock, Carnley, Dearing, and Phillips |
| II | Fourteenth Amendment Deliberate Indifference to Health and Safety | City of Foley, Hellmich, Bullock, Carnley, Dearing, and Phillips |
| III | State Law Negligence and Wantonness | Dearing, Phillips, Gouveia, Bailey, Williams, Ash, Brower |
| IV | State Law Wrongful Death | City of Foley, Hellmich, Bullock, Carnley, Dearing, and Phillips |
| V | Fourteenth Amendment Deliberate Indifference to Serious Medical Needs | Hellmich, Bullock, Carnley, Dearing, Phillips, Gouveia, Bailey, Williams, Ash, and Brower |

---

[3] Plaintiff also asserts Counts I, II, III, IV, and X against Bay Nursing, Inc., Jail Physician, Nurse Rosi, and 2nd Jail Nurse. (Doc. 19 at ¶¶ 60-62, 77-84, 88-89, 97-98, 130-34).

| | | |
|---|---|---|
| VI | Fourteenth Amendment Substantive Due Process | Bullock, Carnley, Dearing, Phillips, Gouveia, Bailey, Williams, Ash, and Brower |
| VII | Section 1983 Supervisory Liability | City of Foley, Hellmich, Dearing,[4] Carnley, Phillips, Gouveia, and Williams |
| VIII | Section 1983 Negligent Supervision and Training | City of Foley, Hellmich, Bullock, Carnley, Dearing, Phillips, Gouveia, and Williams |
| IX | Section 1983 Municipal Liability | City of Foley |
| X | Section 1983 Negligence in Emergency Medical Response | Bullock, Carnley, Dearing, Phillips, Gouveia, Bailey, Williams, Ash, Brower |
| XI | Section 1983 Municipal Liability | City of Foley, Hellmich, and Bullock |

The Court turns first to Plaintiff's Fourteenth Amendment claims brought under 42 U.S.C. § 1983, Counts I, II, V, VI, VII, VIII, IX, X, and XI. (See Doc. 19 at ¶¶ 46-84, 99-118, 125-40). To establish a claim under 42 U.S.C. § 1983, Plaintiff must show: "(1) the violation of a constitutional right or federal statute; and (2) that the violation was committed by a person acting under color of state law." Brennan v. Thomas, 780 F. App'x 813, 820 (11th Cir. 2019) (per curiam); see 42 U.S.C. § 1983.

**A. Section 1983 Official Capacity Claims are Due to be Dismissed.**

The Foley Defendants move to dismiss all official capacity claims asserted against the Individual Defendants as redundant

---

[4] Plaintiff twice lists "Dearing" as a defendant under Count VII. (Doc. 19 at ¶ 114).

because the City of Foley has been named as a defendant (Doc. 25 at 25-26), and Plaintiff consents to the dismissal. (Doc. 31 at 6-7). The law in this circuit is clear that "[b]ecause suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued directly . . . ." Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991) (per curiam); see also Kentucky v. Graham, 473 U.S. 159 (1985) (stating that when an officer is sued under § 1983 in his official capacity, the suit is simply "another way of pleading an action against an entity of which an officer is an agent") (citation omitted). Accordingly, all official capacity claims are due to be dismissed without prejudice and without effect on Plaintiff's individual capacity claims and separate municipal liability (Monell) claim against the City of Foley.

**B. Section 1983 Individual Liability Claims.**

The Individual Defendants move to dismiss the deliberate indifference claims asserted against them on the grounds of qualified immunity. (Doc. 25 at 28-39).

Qualified immunity shields federal and state officials performing discretionary functions from being sued in their individual capacities for "money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or

constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011). "When qualified immunity is asserted in the context of a motion to dismiss, [courts] look to the pleadings to see if the plaintiff has successfully alleged the violation of a clearly established right." O'Rourke v. Hayes, 378 F.3d 1201, 1206 (11th Cir. 2004); see also Snider v. Jefferson State Cmty. Coll., 344 F.3d 1325, 1327 (11th Cir. 2003) ("The defense of qualified immunity may be raised and addressed on a motion to dismiss and will be granted if the 'complaint fails to allege the violation of a clearly established constitutional right.'") (citations omitted). "To receive qualified immunity, a government official first must prove that he was acting within his discretionary authority." Cottone v. Jenne, 326 F.3d 1352, 1357 (11th Cir. 2003). Once the government official satisfies this initial burden, the burden shifts to the plaintiff to show that the official is not entitled to qualified immunity. Id. at 1358.

The Foley Defendants have established that the Individual Defendants were acting within their discretionary authority when the alleged wrongful acts occurred, as Plaintiff acknowledges that "the actions at issue - booking, intake screening and referral, inmate monitoring and welfare checks, and decisions regarding access to medical care – are the kind of job-related functions jail officers perform through means within their power to utilize."

(Doc. 31 at 7). Specifically, Plaintiff asserts Mayor Hellmich and Chief Bullock were policymakers who were responsible for operation, management, funding, making and enforcing policy and procedures, training corrections officers, and confinement of inmates at the jail (Doc. 19 at ¶¶ 3-4); thus, these functions are well within Mayor Hellmich's and Chief Bullock's discretionary authority. See Harper v. Harris, 2019 U.S. Dist. LEXIS 27260, at *45, 2019 WL 764175, at *17 (N.D. Ala. Feb. 21, 2019) (holding administrative and supervisory jail officials acted within their discretionary authority "either by setting policies for the Jail . . . or supervising others in their care of the Plaintiff").

Plaintiff also alleges Chief Bullock, Deputy Chief Carnley, Jail Cmdr. Dearing, and Chief Corrections Officer Phillips were responsible "for enforcing policies and procedures at the Foley city jail facility at all relevant times and for training of jail staff and personnel" (Doc. 19 at ¶ 4); thus, these functions fall within Chief Bullock's, Deputy Chief Carnley's, Jail Cmdr. Dearing's, and Chief Corrections Officer Phillips's discretionary authority. See Bailey v. Hughes, 815 F. Supp. 2d 1246, 1258 (M.D. Ala. Sept. 30, 2011) (holding "supervising corrections officers" is "well within the 'arsenal of powers' provided to the supervisory defendants to accomplish the goal of running a functional correctional facility"). Plaintiff alleges Officers Gouveia, Bailey, Williams, Ash, and Brower "were responsible for

implementing the policies and procedures of the Foley city jail for the care, custody, and control of inmates" (Doc. 19 at ¶¶ 5-7); thus, these functions fall within Officer Gouveia, Bailey, Williams, Ash, and Brower's discretionary authority. See Donald v. Norris, 131 F.4th 1255, 1265 (11th Cir. 2025) (holding corrections official acted within his discretionary authority when making decisions regarding inmate healthcare). Accordingly, each Individual Defendant was acting within his or her discretionary authority at the time the complained of actions arose. See Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265-66 (11th Cir. 2004) (discretionary-authority inquiry asks whether the official was performing a legitimate job-related function through means within his power, not whether the act was done lawfully).

"[T]he burden [now] shifts to the plaintiff to show (1) that the official violated a constitutional right and (2) that the right was clearly established at the time of the alleged violation." Marbury v. Warden, 936 F.3d 1227, 1232 (11th Cir. 2019) (per curiam). Both elements of the two-pronged test must be present for an official to lose qualified immunity, and the two-pronged analysis may be done in whatever order is deemed appropriate for the case. Barnett v. City of Florence, 409 F. App'x 266, 270 (11th Cir. 2010) (per curiam) (citing Pearson v. Callahan, 555 U.S. 223, 241 (2009)).

**1. Count X does not demonstrate a constitutional violation.**

Plaintiff alleges in Count X that "Defendants Bullock, Carnley, Dearing, Phillips, Gouveia, Bailey, Williams, Ash, and Brower owed Mr. Myers a duty to respond promptly and adequately to his medical emergencies while he was in their custody," and that these Defendants "breached this duty by failing to take and act on a proper medical history" and failing to provide timely, lifesaving care before Myers's medical condition became life threatening. (Doc. 19 at ¶¶ 131-32). Plaintiff also claims "Defendants' actions were negligent, incompetent, and unskillful, violating their duty to provide timely medical assistance to detainees in life-threatening situations," and that Defendants' actions contravened their "own written protocols and policies for handling medical emergencies." (Id. at ¶ 133).

Count X fails to allege infringement of a constitutional right. Instead, Count X, as the Foley Defendants argue, alleges simple negligence. And negligence does not rise to the level of a constitutional claim actionable under § 1983. County of Sacramento v. Lewis, 523 U.S. 833, 849 (1998) ("[T]he Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."). Even if the Court looks beyond Plaintiff's labels of "negligence" and "breach of duty," as Plaintiff asks the Court to do (see Doc. 31 at 8), the factual

allegations fail to establish deliberate indifference to an emergent medical need as explained below. For these reasons and those explained in the Foley Defendants' motion, Count X is due to be dismissed for failure to state a claim under § 1983, and the Individual Defendants are entitled to qualified immunity on the claim.

### 2. Counts I, II, V, and VI do not demonstrate a constitutional violation under § 1983.

Counts I, II, V, and VI assert claims of deliberate indifference to a serious medical need under the Fourteenth Amendment. (Doc. 19 at ¶¶ 46-84, 99-112). "The Fourteenth Amendment requires government officials to provide basic necessities, including medical care, to pretrial detainees." Ireland v. Prummell, 53 F.4th 1274, 1287 (11th Cir. 2022). Plaintiff asserts broad claims that the jailers, Gouveia, Bailey, Williams, Ash, and Brower, had knowledge of Myers's urgent medical needs, knew his medical conditions of heart disease, high blood pressure, and alcoholism would be exacerbated with delay in obtaining medical treatment, and with this knowledge failed to obtain medical treatment and failed to monitor Myers's medical conditions. (Id. at ¶¶ 47-48; Count I). Plaintiff claims the Individual Defendants all "knew or should have known" Myers's medical conditions of heart disease, high blood pressure, and lack of medication, combined with his history of alcoholism, created

the potential for cardiac arrhythmia and required timely medical intervention, which was denied. (Id. at ¶¶ 101-02, Count V). Plaintiff alleges the denial and/or delay in care was due to the longstanding practice of underfunding the jail, causing unwritten cost saving measures to be followed (over written jail policies), resulting in untrained and/or poorly trained officers making medical decisions and medical care, and hospitalizations being denied. (Id. at ¶ 52, 63-71, 99-112, Counts I, II, V, VI). Plaintiff also alleges Defendants' unwritten customs and practices violated their own written protocols, rules, and regulations for treating detainees with chronic medical issues, like Myers. (Id. at ¶ 104, Count V, see also ¶ 107, Count VI).

"To prevail on a deliberate indifference to serious medical need claim, [Plaintiff] must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and [Myers's death]." Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306-07 (11th Cir. 2009). A prison official acts with deliberate indifference if he (1) has subjective knowledge of a risk of serious harm, (2) disregards that risk, and (3) engages in conduct that amounts to subjective recklessness. See Farmer v. Brennan, 511 U.S. 825, 836-40 (1994). The Eleventh Circuit recently clarified that "subjective recklessness" is only satisfied if the plaintiff shows "that the defendant actually knew that his conduct — his own acts or

omissions — put the plaintiff at substantial risk of serious harm."
Wade v. McDade, 106 F.4th 1251, 1253 (11th Cir. 2024) (en banc).

### a. Objectively Serious Medical Need

A "serious medical need is [] one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003) (internal quotation marks and citation omitted). "In either of these situations, the medical need must be one that, if left unattended, poses a substantial risk of serious harm." Id. (internal quotation marks, brackets, and citation omitted). The Complaint alleges that Myers had three chronic serious medical conditions of which the Individual Defendants were aware: alcoholism, high blood pressure, and heart disease (see Doc. 19), but the booking videos prove Myers disclosed having ulcers and high blood pressure during his intake screening – not alcoholism or heart disease. (Doc. 26, Ex. 1 at 10:17:09 AM).

Myers's ulcers did not constitute a serious medical need. He did not indicate that he was under treatment for ulcers at the time he was booked into the jail. And when asked if he was experiencing any symptoms of which the jail staff should be aware, Myers said no. Accordingly, there is no evidence or suggestion that Myers's ulcers were a serious medical need that required treatment. (Id., Ex. 1 at 10:18:21 AM).

As to whether Myers's alcoholism constitutes a serious medical need, the Court construes the facts in the light most favorable to the Plaintiff and finds that Officers Gouveia, Bailey, and Brower knew that Myers drank alcohol the night before being booked into the jail, that he had a .224 BAC level when entering the jail, and that he was an alcoholic.[5] However, there is no support in the Complaint allegations or jail video recordings that Myers suffered from any visible symptoms of intoxication or withdrawal while detained at the jail.[6] Instead, both the Complaint and jail video footage reflect that Myers did not suffer a medical need so obvious that a lay person would recognize the need for treatment, Mann, 588 F.3d at 1307, as the arresting deputies did not report that Myers was intoxicated, did not conduct a field sobriety test on Myers, and did not arrest Myers for an alcohol-related offense. (Doc. 19 at ¶¶ 16-17). During booking and while detained, Myers walked normally and unassisted about the jail and in his cell; he answered all questions coherently,

---

[5] (See Doc. 26, Ex. 1 at 10:10:57 AM; 10:10:17:09 AM; 10:39:40 AM); see also id. at 2:42:32 AM, when Myers's brother-in-law told the booking officers and informed them that Myers "is an alcoholic").

[6] Plaintiff's assertion, in response to this motion, that upon booking into the jail, Myers "displayed obvious symptoms visible to any layperson, including profuse sweating, chest pain, and tremors" (Doc. 31 at 3) is not alleged in the Complaint (see Doc. 19) and is simply not borne out by the jail video footage. (See Doc. 26, Exs. 1-5).

intelligibly, without slurring or difficulty.[7]  He made phone calls, ate lunch, used the restroom, talked with his cellmate, conversed with officers, and slept.[8]  Myers also specifically stated upon booking that he was not experiencing withdrawals or any symptoms of which the jail staff should be aware.[9]  And thereafter, Myers did not alert anyone to a medical need.

Plaintiff has provided no caselaw, and the Court has found none, after an exhaustive search, that holds that alcoholism or a high BAC (without symptoms of withdrawal or intoxication) demonstrates as a serious medical need – that is, a need that was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Taylor v. Hughes, 920 F.3d 729, 733 (11th Cir. 2019) (quotation marks and citation omitted); but cf., Harper v. Lawrence County, Ala., 592 F.3d 1227, 1235 (11th Cir. 2010) ("This Circuit has stated that its prior cases 'established that a jail official who is aware of but ignores the dangers of acute alcohol withdrawal and waits for a manifest emergency before obtaining medical care is deliberately indifferent to the inmate's constitutional rights.'") (quoting Lancaster v. Monroe County, Ala., 116 F.3d 1419, 1426 (11th Cir.

---

[7] (See Doc. 26, Exs. 1-5).

[8] (See Doc. 26, Ex. 2).

[9] (Doc. 26, Ex. 1 at 10:18:21 AM).

1997)), abrogated on other grounds by Randall v. Scott, 610 F.3d 701 (11th Cir. 2010). The law in this circuit is clear: "The Constitution does not require an arresting police officer or jail official to seek medical attention for every arrestee or inmate who appears to be affected by drugs or alcohol." Burnette v. Taylor, 533 F.3d 1325, 1333 (11th Cir. 2008). In Burnette, the decedent exhibited symptoms consistent with use of drugs or alcohol; family told the arresting officers of the decedent's drug use; decedent possessed a bottle of pills; decedent's speech was slurred; and decedent needed assistance to move from one cell to another, but the court found the symptoms did not necessarily indicate a serious medical need. Id. at 1331-32.

In Henson v. Walker County, U.S. Dist. LEXIS 229139, 2020 WL 7211164 (N.D. Ala. Dec. 7, 2020), the district court held an arrestee "didn't have an objectively serious medical need" even though she "was hallucinating and acting erratically" and "was 'under the influence of alcohol, narcotics or other drugs to the degree that she endangered herself or another or property.'" 2020 U.S. Dist. LEXIS 229139, at *9-10, 2020 WL 7211164, at *4. The court explained that because the arrestee "hadn't yet exhibited withdrawal symptoms like vomiting or diarrhea . . . her medical need wasn't so obvious that 'even a lay person' would recognize she needed immediate medical attention." Id., 2020 U.S. Dist. LEXIS 229139, at *10-11, 2020 WL 7211164, at *4.

The facts here are closely aligned with Hays v. Pearson, 2025 U.S. Dist. LEXIS 122954, 2025 WL 1747145 (D. Wyo. May 27, 2025), appeal dismissed, 2025 U.S. App. LEXIS 34225, 2025 WL 3855145 (10th Cir. Aug. 19, 2025), a recent case from a sister court in the Tenth Circuit. The court found no serious medical need where Mr. Hays was booked into jail with a BAC of 0.357% but showed no signs of acute intoxication, no symptoms of alcohol withdrawal, no characteristics common to many intoxicated individuals (i.e., he was not slurring his words, he did not display any balance or movement issues, he responded appropriately to questions and engaged in conversation with multiple deputies, and he changed into detention center clothing without assistance). Hays, 2025 U.S. Dist. LEXIS 122954, at *13-14, 2025 WL 1747145, at *6. This determination was made despite violation of the jail's policy that detainees with a BAC over .300% were to be medically cleared by a doctor prior to incarceration, and Mr. Hays did not receive this medical clearance. Id., 2025 U.S. Dist. LEXIS 122954, at *15-16, 2025 WL 3855145, at *6 (finding that the detention center's policy did "not transform every BAC over 0.300% into an objectively serious medical need").

Accordingly, Myers's alcoholism, which was devoid of symptoms of severe intoxication or withdrawal during the period in question, was not a medical condition so obvious that a lay person would recognize the need for a doctor's attention, nor did it appear

that a delay in medical treatment "posed a substantial risk of serious harm." <u>Hill</u>, 40 F.3d at 1187. Consequently, Plaintiff has failed to establish that Myers's alcoholism constituted an objectively serious medical need.[10]

With respect to Myers's high blood pressure, Defendants rely on <u>Dickson v. Colman</u>, 569 F.2d 1310, 1311 (5th Cir. 1978) (per curiam), to assert that Myers's high blood pressure was not a serious medical need. (<u>See</u> Doc. 25 at 31). The facts of <u>Dickson</u>, however, are distinguishable from Myers's. Dickson sued after receiving no medical attention from May (when booked into the jail) until he requested medical attention in November. <u>Id.</u> at 1311. After making a written request for medical attention and complaining to guards of dizziness and headaches, Dickson was

---

[10] The Court acknowledges the unsettling nature of the current state of the law on this issue, as pointed out by the court in <u>Hays</u>:

> The Court has done its utmost to decipher and apply the relevant law to this matter, yet it can't help but observe the current state of the law seems to disadvantage the serious alcohol or drug abuser when they may be the most in need of medical intervention upon arrest. Detainees who function relatively normally with high BACs or while high on drugs, likely because of their experience and tolerance with the substance, are more likely to be denied timely medical treatment precisely because they function normally during the arrest and booking, but they are the ones most likely to suffer serious and dangerous withdrawal thereafter.

<u>Hays</u>, 2025 U.S. Dist. LEXIS 122954, at *19-20, 2025 WL 1747145, at *7.

examined by a physician the next day.  The examination revealed elevated blood pressure, and Dickson was prescribed blood pressure medication.  The court determined, however, that the "seriousness" of the plaintiff's medical needs was contradicted by the affidavit put forth by the examining physician that stated the plaintiff's blood pressure presented "no true danger" or "serious threat" to his health.  Id. at 1311-12.  In contrast, here, Defendants Gouveia, Brower, and Bailey knew upon booking that Myers had high blood pressure, took medication for his high blood pressure, did not have his medication with him, and knew that no one could bring the medication to the jail.  Thus, it is possible that Myers's high blood pressure constitutes a serious medical need.  See, e.g., Usoh v. Lewis, 2025 U.S. Dist. LEXIS 180412, at *14, 2025 WL 2646521, at *5 (S.D. Ga. Sep. 15, 2025) ("Plaintiff's high blood pressure could, potentially, constitute a serious medical need that posed a risk of serious harm if unattended."); Benton v. Torres-Gonzalez, 2013 U.S. Dist. LEXIS 28799, at *18, 2013 WL 791013, at *5 (N.D. Fla. Feb. 11, 2013) ("The need to treat high blood pressure is obvious even to a lay person."); Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000) (stating a serious medical need is "one that, if left unattended, poses a substantial risk of serious harm" (quotation and brackets omitted); Baskerville v. Blot, 224 F. Supp. 2d 723, 735 (S.D.N.Y. 2002) ("[A] prescription for high blood pressure arguably indicates that [the inmate] may

have an objectively serious medical condition that needed to be controlled through medication."); but see Rainey v. Boyd, 2012 U.S. Dist. LEXIS 124681, at *29, 2012 WL 3778356, at *10 (D. Colo. Aug. 15, 2012) ("Although high blood pressure may mandate treatment by a physician in the form of medication, suffering high blood pressure alone has been found not to constitute a sufficiently serious medical condition for purposes of the Eighth Amendment.") (emphasis in original), report and recommendation adopted, 2012 U.S. Dist. LEXIS 124677, 2012 WL 3778351 (D. Colo. Aug. 31, 2012). Accordingly, for purposes of this motion, the Court considers Myers's high blood pressure a serious medical need. The question thus becomes whether the Complaint plausibly alleges that Defendants were deliberately indifferent to the need.

### b. **Deliberate Indifference.**

Again, deliberate indifference requires Plaintiff to plausibly allege that the defendant: (1) "was subjectively aware that the inmate was at risk of serious harm"; (2) "disregarded that risk"; and (3) "acted with 'subjective recklessness as used in the criminal law.' " Wade, 106 F.4th at 1255 (quoting Farmer, 511 U.S. at 839). This requires a plaintiff to demonstrate more than an inadvertent failure to provide medical attention or negligence in treating a medical condition. Estelle v. Gamble, 429 U.S. 97, 105-07 (1976). It requires a plaintiff to show "something approaching a total unconcern for [an inmate's] welfare

in the face of serious risks." Duane v. Lane, 959 F.2d 673, 677 (7th Cir. 1992). Plaintiff alleges in the Complaint that the Defendants knew or should have known that Myers's high blood pressure and lack of medication, combined with his history of alcoholism, created the potential for cardiac arrhythmia, which required timely medical intervention; yet Defendants denied him medical treatment. (Doc. 19 at ¶¶ 101-02). Defendants assert and the jail camera footage supports that no Individual Defendant (1) was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed to Myers; (2) no defendant drew that inference; (3) no defendant disregarded the risk of serious harm to Myers; and (4) no defendant's conduct amounted to criminal recklessness. See Ireland, 53 F.4th at 1287; Wade, 106 F.4th at 1262; see also Bowen v. Warden, 826 F.3d 1312, 1320-21 (11th Cir. 2016) ("A prison official possesses actual, subjective knowledge of a substantial risk when the official is 'both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and also draws the inference.'") (emphasis added, internal alterations omitted) (quoting Farmer, 511 U.S. at 837).

To start, the Complaint does not allege that Mayor Hellmich, Chief Bullock, Deputy Chief Carnley, Jail Cmdr. Dearing, or Chief Corrections Officer Phillips were present during Myers's detention. As for the jailers who were on duty during Myers's detainment,

Gouveia, Bailey, Brower, Williams, Ash, and Deisner, Myers did not display any medical symptoms or have any medical complaints before Officer Deisner found him deceased. As previously discussed, Myers communicated coherently and clearly while at the jail.[11] Myers exhibited no symptoms that indicated a dangerous level of intoxication or withdrawal symptoms, high blood pressure, or heart issues.[12] Myers did not convey when he last took his blood pressure medication, when his next dosage was due, nor did he indicate that he would suffer any harm without his medication during his sixteen-hour hold so as to demonstrate the jailers knew or were aware he was at a substantial risk of serious harm and failed to reasonably respond to the risk. See Denison v. Corr. Health Partners, 2014 U.S. Dist. LEXIS 58585, at *33-34 (D. Colo. Apr. 3, 2014) (because the plaintiff alleged no other medical conditions arising or resulting from his high blood pressure that might prove "sufficiently serious," the court found that plaintiff failed to allege constitutional claim).

Instead, the video reflects that Myers confirmed he was not experiencing any symptoms of which the jail staff should be aware.[13] Myers never asked for medical attention, though he repeatedly

---

[11] (Doc. 26, Ex. 1 at 10:16:16 to 10:53:22 AM; see also Ex. 2).

[12] (Doc. 26, Exs. 1-5).

[13] (Doc. 26, Ex. 1 at 10:18:21 AM).

talked to jail officers about other matters.[14]  See Youmans v.
Gagnon, 626 F.3d 557, 566 n.12 (11th Cir. 2010) (per curiam)
("[W]here Plaintiff engaged in conversation on different topics,
Plaintiff's failure to request medical care supports our
determination that objectively reasonable law enforcement
officers—held to the standard of a layperson, rather than a trained
medical professional—would not be on notice that Plaintiff needed
immediate medical care."). Based on the Complaint allegations and
the jail videos, it cannot be said that any Individual Defendant
actually knew or was aware of facts from which the inference could
be drawn that Myers was at a substantial risk of serious harm,[15]
as knowledge that Myers was an alcoholic with a high BAC who
possibly missed a dose of blood pressure medication does not
demonstrate an obvious and substantial risk of serious harm, where
Myers exhibited no obvious symptoms of distress.  Cf. Campbell v.
Sikes, 169 F.3d 1353, 1364 (11th Cir. 1999) ("Proof that the
defendant should have perceived the risk, but did not, is
insufficient.").

---

[14] (Doc. 26, Exs. 1, 2, 5, & 6).
[15] Plaintiff maintains that the "officers were presented with facts
showing a substantial risk – visible chest pain, profuse sweating,
tremors – at booking and thereafter," such that a substantial risk
of harm could be inferred from the circumstances.  (Doc. 31 at
9).  However, the Complaint is void of such factual allegations.
(See Doc. 19 ¶¶ 25-34, 47-54).  And neither are such factual
allegations supported by the jail videos.

Plaintiff contends Defendants disregarded the risk of harm to Myers and acted with criminal recklessness by "ignoring obvious signs of medical crisis and failing to screen/medicate/monitor for hours," and alleges "multi-hour lapses in welfare checks despite escalating signs of distress." (Doc. 31 at 9 (citing Doc. 19 at ¶¶ 29-34, 50-54, 72-75)). Again, Plaintiff has not demonstrated the "obvious signs of medical crisis," and the jail videos produced with this motion are contrary to these conclusory allegations put forth in the Complaint and presented in Plaintiff's response to this motion. See Twombly, 550 U.S. at 555 (explaining that labels, conclusions, and formulaic recitations of the elements of a cause of action are not sufficient to state a claim). Rather, the jail videos confirm that a medical history was obtained from Myers during booking.[16] Officers responded to all four of Myers's calls on the intercom.[17] Officers checked on Myers sixteen times, and averaged going in or checking on Myers approximately every hour while detained.[18] No signs of a medical crisis or escalating signs

---

[16] (Doc. 26, Ex. 1 at 10:16:16 AM to 10:18:54 AM).

[17] (Doc. 26, Exs. 1, 2, 3, & 4 at 3:01:38 PM to 3:02:03 PM, 3:13:57 PM to 3:14:32 PM, 3:55:56 PM to 3:59:51 PM, 5:02:06 PM to 5:04:27 PM).

[18] (Doc. 26, Exs. 1, 3, & 4 at 11:24:27 AM, 12:09:31 PM; 1:05:02 PM; 2:09:51 PM; 2:49:07 PM, 3:01:57 PM; 3:08:36 PM; 3:39 PM; 4:01:20 PM; 4:44:00 PM, 5:04:27; 5:33:34 PM, 6:22:40 PM; 6:54:18 PM, 6:54:50 PM; 8:05:10 PM, 8:13:44 PM; 8:17:58 PM; 8:37:15 PM; 8:57:36 PM, 9:55:57 PM, 11:12:39 PM; 11:46:42 PM, 12:32:50 AM, 1:19:46 AM, 2:50:24 AM, 3:46:38 AM, 4:50:42 AM, 6:15:34 AM).

of distress are observed.  Instead, Myers appeared to be sleeping each time a cell check was conducted.  Any delay in Defendants' response must be measured against what the Defendants *actually knew* at the time.  Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005) (per curiam) (explaining that subjective knowledge under the deliberate indifference standard requires that the defendant "*both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* [] must also draw the inference") (emphasis in original) (quoting Farmer, 511 U.S. at 837).  Again, whether Defendants had *actual knowledge* "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . ."  Id. (quoting Farmer, 511 U.S. at 842).  Here, the facts and all reasonable inferences drawn from the facts simply do not indicate that Defendants disregarded a risk of harm to Myers or acted with criminal recklessness.

While the fact that Defendants did not recognize when Myers transitioned from comfortably sleeping to unconsciousness and death, between the hours of 1:23 a.m. and 6:55 a.m., is  tragic, it falls far short of a constitutional violation.  The jail officers, as mentioned, repeatedly responded to and checked on Myers.  Throughout the night, the jail officials looked inside Myers's cell approximately every hour, and Myers appeared to be sleeping.  There were no visible signs that Myers was ever in need

of medical attention, much less experiencing a medical emergency. See Goodman v. Kimbrough, 718 F.3d 1325, 1333 (11th Cir. 2013) (inadequate cell checks may be "negligence of the purest form," but they do not amount to deliberate indifference standing alone).

To the extent Myers claims Defendants failed to follow their own policies, rules, and regulations, his allegations fall short of establishing a constitutional violation. See Taylor, 221 F.3d at 1259 (noting that "failure to follow procedures does not, by itself, rise to the level of deliberate indifference because doing so is at most a form of negligence"); Nam Dang by and through Vina Dang v. Sheriff, Seminole Cnty., 871 F.3d 1272, 1282 (11th Cir. 2017) ("A violation of Jail policy does not in itself rise to the level of deliberate indifference."). Likewise, to the extent Plaintiff alleges Defendants should have known Myers's health or safety was at risk or Defendants failed to properly monitor Myers while detained at the jail, Plaintiff's allegations allege negligence at most. See Adams v. Poag, 61 F.3d 1537, 1543 (11th Cir. 1995) (stating that "[m]ere negligence in diagnosing or treating a medical condition" is not enough to show deliberate indifference); Farmer, 511 U.S. at 838 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as [a constitutional violation].").  Accordingly, the

Complaint does not demonstrate that the Individual Defendants acted with deliberate indifference resulting in Myers's death.

### c. **The Complaint does not demonstrate that any Individual Defendant violated clearly established law.**

"In this circuit, the law can be clearly established for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose."  Lee v. Ferraro, 284 F.3d 1188, 1197 n.5 (11th Cir. 2002).  The law in this circuit, as previously discussed, sets a criminal recklessness standard for deliberate indifference, see Wade, 106 F.4th at 1253, making inapplicable pre-Wade decisions that allowed for "more than mere negligence" or "more than gross negligence" deliberate indifference standards. Plaintiff has pointed to no pre-existing Supreme Court decision, Eleventh Circuit decision, or Alabama Supreme Court decision that found a constitutional violation "in the situation [the Individual Defendants] confronted."  City of Tahlequah, Okla. v. Bond, 595 U.S. 9, 12 (2021) (per curiam) (quoting District of Columbia v. Wesby, 583 U.S. 48, 63 (2018)).  Nor has the Court has found law that supports finding a constitutional violation for the failure to render medical attention to an inmate with no symptoms, no obvious signs of distress, and who has not requested medical attention, simply because the inmate had a history of alcoholism and a missed dosage of high blood pressure medication (or any

medication).  Accordingly, the Individual Defendants should be granted qualified immunity on all § 1983 claims.

## C. Section 1983 Supervisory Liability Claims.

In Counts I, II, V, VI, VII, VIII, X, and XI, Plaintiff asserts various supervisory liability claims against Mayor Hellmich, Chief Bullock, Deputy Chief Carnley, Jail Cmdr. Dearing, Chief Corrections Officer Phillips, Officer Gouveia, and Officer Williams (collectively "the Supervisory Defendants").  (Doc. 19, see generally ¶¶ 46–84, 99–124, 130–40).

"The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous."  Braddy v. Fla. Dep't of Lab. & Emp. Sec., 133 F.3d 797, 802 (11th Cir. 1998).  "It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."  Christmas v. Harris Cnty., Georgia, 51 F.4th 1348, 1355 (11th Cir. 2022) (quoting Cottone, 326 F.3d at 1360).  Supervisory liability occurs only when the supervisor "personally participates" in the alleged unconstitutional conduct or when there is a "causal connection between the actions of a supervising official and the alleged constitutional deprivation."  Id. (quoting Cottone, 326 F.3d at 1360).  A causal connection may be established when:

(1) a history of widespread abuse puts the responsible
supervisor on notice of the need to correct the alleged
deprivation, and he or she fails to do so; (2) a
supervisor's custom or policy results in deliberate
indifference to constitutional rights; or (3) facts
support an inference that the supervisor directed
subordinates to act unlawfully or knew that subordinates
would act unlawfully and failed to stop them from doing
so.

Myrick v. Fulton County, Ga., 69 F.4th 1277, 1298 (11th Cir. 2023)

(quoting Mathews v. Crosby, 480 F.3d 1265, 1270 (11th Cir. 2007)).

Moreover, there can be no supervisory liability when there is no

underlying constitutional violation.  Knight through Kerr v.

Miami-Dade County, 856 F.3d 795, 821 (11th Cir. 2017).

To start, Plaintiff has failed to establish an underlying

constitutional violation, such that his supervisory claims should

be dismissed.  See Stalley v. Cumbie, 124 F.4th 1273, 1288 (11th

Cir. 2024) ("[I]f a subordinate is entitled to qualified immunity

for his conduct, his supervisor is also entitled to qualified

immunity for that same conduct").  However, even if Plaintiff were

able to state a plausible constitutional violation for denial or

delay of medical care, Plaintiff has not established a causal

connection between a supervisor and the deprivations alleged in

the Complaint, and the Supervisory Defendants are entitled to

qualified immunity.

First, the Complaint neither alleges nor demonstrates a

history of widespread abuse.  Williams v. Santana, 340 F. App'x

614, 617 (11th Cir. 2009) (per curiam) ("The deprivations that

constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences.") (quoting Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990)). Second, Plaintiff's allegations of liability due to customs or policies are simply conclusory and, thus, insufficient to state a supervisory liability claim. Doe v. Sch. Bd. of Broward Cnty., 604 F.3d 1248, 1267 (11th Cir. 2010). A complaint fails to state a policy-based claim when it does not "describe any of the policies that were in place, the sort of policies that should have been in place, or how those policies could have prevented" the plaintiff's harm. Franklin v. Curry, 738 F.3d 1246, 1251 (11th Cir. 2013) (per curiam). "[T]o prove that a policy or its absence caused a constitutional harm, a plaintiff must point to multiple incidents or multiple reports of prior misconduct . . . ." Piazza v. Jefferson County, Ala., 923 F.3d 947, 957 (11th Cir. 2019) (internal citations omitted); see also Depew v. City of St. Marys, Ga., 787 F.2d 1496, 1499 (11th Cir. 1986) (observing that "random acts or isolated incidents are insufficient to establish a custom or policy").

In Count I, Plaintiff asserts Mayor Hellmich, Chief Bullock, and Deputy Chief Carnley maintained a longstanding practice of underfunding or inadequately funding the Foley police department and city jail, and Jail Cmdr. Dearing and Chief Corrections Officer

Phillips had a longstanding, unwritten policy to cut costs and medical expenses. (Doc. 19 at ¶¶ 52-59). Count II alleges Mayor Hellmich, Chief Bullock, and Deputy Chief Carnley had a custom of underfunding of the jail and allowing untrained/undertrained officers to make medical care decisions for inmates, and Jail Cmdr. Dearing and Chief Corrections Officer Phillips maintained an unwritten policy that included understaffing and inadequate screening of inmates, inadequate jailer training, and allowing of untrained and/or poorly trained officers to make decisions regarding the necessary medical care for detainees. (Id. at ¶¶ 63-76). And in Count XI, Plaintiff reasserts a claim of "systematic underfunding of the Foley City Jail" and "[p]rioritization of cost-saving measures over the health and safety of pretrial detainees" by Mayor Hellmich and Chief Bullock. (Id. at ¶ 137).

No doubt, it is clearly established in this Circuit that denial or delay of an inmate's access to healthcare to save costs or increase profits is a constitutional violation. See Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 704 (11th Cir. 1985). However, the Complaint allegations of underfunding of the jail do not state a claim for supervisory liability because Plaintiff has failed to causally connect the custom or policy to underfund and/or understaff the jail to the alleged failure to provide medical care

to Myers.[19]  See Goodwin v. Fulton County, 2025 U.S. Dist. LEXIS

220161, at *10 (N.D. Ga. Nov. 6, 2025) (finding "an allegation of

a policy of underfunding or understaffing, without more, is

likewise too conclusory to state a claim") (citing McDowell v.

Brown, 392 F.3d 1283, 1289-91 (11th Cir. 2004) ("McDowell cannot

rely on a generalized policy of understaffing.")).  Contrarily,

the jail video recordings reflect that the jail was sufficiently

staffed at every hour to respond to inmates being booked into and

leaving the jail, to answer incoming calls to the jail, to respond

to Myers's intercom calls, to feed the inmates, and to conduct

routine rounds to check all cell units.  (See Doc. 26, Exs. 1, 3);

see also Boyd v. Nichols, 616 F. Supp. 2d 1331, 1345 (M.D. Ga.

2009) (the plaintiff must also "show that the alleged

constitutional violation here was a 'highly predictable

consequence' of [the alleged] failure to budget and adequately

staff the Jail").  Moreover, there are no allegations in the

Complaint indicating that the supervisory defendants were on

---

[19] Defendants further contend that the "cost-avoidance theory" is
implausible because the "EMTALA requires hospitals to treat
patients who present with medical emergencies regardless of their
ability to pay, see 42 U.S.C. § 1395dd, and in Baptist Health
Systems, Inc. v. City of Midfield, 792 So. 2d 1095, 1096 (Ala.
2001), the Supreme Court of Alabama held cities are not obligated
to reimburse hospitals for inmates' emergency medical care.  The
City was already paying Bay Nursing, Inc. to provide medical
services inside the jail, (Doc. 19, PageID.149, ¶ 8), and under
EMTALA and Baptist Health, the City could take its inmates to a
hospital for emergency medical treatment at no cost to the City."
(Doc. 25 at 46).

notice or had reason to know that the jail was underfunded and/or understaffed and failed to correct the problem. Craig v. Floyd Cnty., Ga., 643 F.3d 1306, 1310 (11th Cir. 2011) (finding a single incident of unconstitutional activity is insufficient to establish a custom or policy to impose supervisory liability).

Count V alleges Mayor Hellmich "failed to ensure the implementation of adequate medical protocols at the Foley City Jail," and that Chief Bullock "failed to address systemic deficiencies." (Doc. 19 at ¶ 103). Count V also alleges Mayor Hellmich and Chief Bullock maintained "unwritten customs and practices [that] violated their own written protocols, rules, and regulations for treating detainees with chronic medical issues." (Id. at ¶ 104). Count VI alleges Chief Bullock, Deputy Chief Carnley, Jail Cmdr. Dearing, and Chief Corrections Officer Phillips maintained customs that "undermined detainee care and violated established medical treatment protocols." (Id. at ¶ 110). Count VII alleges the Supervisory Defendants "knew or should have known about systemic deficiencies in training, supervision, and policies that created a substantial risk of harm to pretrial detainees, . . . [and] [d]espite this knowledge, Defendants failed to implement or enforce policies and training procedures necessary to prevent deliberate indifference." (Id. at ¶¶ 115-116).

Counts V, VI, and VII fail to state a policy-based claim because Plaintiff has not "describe[d] any of the policies that

were in place, the sort of policies that should have been in place, or how those policies would have prevented" the plaintiff's harm. Franklin v. Curry, 738 F.3d 1246, 1251 (11th Cir. 2013) (per curiam). The Complaint allegations are again conclusory and fail to demonstrate that the supervisors were on any type of notice of the alleged violations to impose supervisory liability. See Brown v. Elmore Cnty. Comm'n, 2022 U.S. Dist. LEXIS 44406, at *22, 2022 WL 779772, at *8 (M.D. Ala. Mar. 14, 2022) (finding complaint allegations conclusory and insufficient and granting sheriff qualified immunity where complaint vaguely referenced "policies and customs" but did "not identify any specific policy or custom, nor [did] it detail any other incidents where medical care was delayed or denied to pre-trial detainees at the . . . Jail, or allege that Sheriff [] directed medical staff to delay or withhold treatment").

Count VIII alleges the Supervisory Defendants negligently supervised and trained subordinate jail officials and breached their duty to train and supervise jail staff. (Id. at ¶¶ 119-24). Similarly, Count X alleges the Supervisory Defendants had a duty to respond to Myers's medical emergencies and breached this duty by "failing to provide lifesaving medication, monitoring, and timely emergency care," such that their "actions were negligent, incompetent, and unskillful, violating their duty to provide timely medical assistance to detainees in life-threatening

situations" as provided by the jail's written protocols. (Id. at ¶¶ 130-134). These allegations of negligence are insufficient to state a constitutional claim under § 1983. "Section 1983 requires more than negligence." Anderson v. Ga. State Pardons & Parole Bd., 165 F. App'x 726, 729 (11th Cir. 2006) (per curiam). "A supervisor cannot be held liable pursuant to § 1983 for negligence in the supervision or training of his employees." Higginbotham v. City of Pleasant Grove, 2013 U.S. Dist. LEXIS 141566, at *122, 2013 WL 5519577, at *42 (N.D. Ala. Sept. 30, 2013).

Count XI alleges Mayor Hellmich and Chief Bullock failed "to train and supervise jail staff and medical personnel on the recognition and treatment of serious medical conditions" (Doc. 19 at ¶ 137); Count VII alleges that the Supervisory Defendants failed to adequately train subordinates (id. at ¶¶ 113-118); and Count VIII alleges the Supervisory Defendants breached their duty to provide adequate training and supervision regarding the identification of chronic medical conditions and treatment of medical emergencies (id. at ¶¶ 119-24). However, the Complaint is void of any factual allegation or indication that a supervisory official was ever put on notice of the need for any corrective measures to be taken regarding the alleged deficiencies to demonstrate liability for failure to train jail employees. Keith v. DeKalb County, Ga., 749 F.3d 1034, 1053 (11th Cir. 2014) (stating that "a pattern of similar constitutional violations by

untrained employees is ordinarily necessary" for a failure to train to amount to deliberate indifference).

Likewise, where an injury occurs as a result of a correctional officer violating jail policies, the supervisory officials responsible for issuing the policies cannot be liable when they are not aware that employees routinely violated the policy. See id. at 1049; see also Vielma v. Gruler, 808 F. App'x 872, 883 (11th Cir. 2020) (per curiam) (characterizing allegations of failing to "adequately" train officers as conclusory). Here, Plaintiff has not alleged that any Supervisory Defendant had actual or constructive notice that there was a particular omission in the training program for providing medical care for detainees or identifying chronic and emergent medical needs of detainees and that, armed with that knowledge, the supervisors chose to retain that training program. Nor are there any factual allegations of a pattern of similar constitutional violations by untrained employees so as to establish actual or constructive notice of the deficiency of any training. The Complaint is also devoid of any factual allegations establishing that jail employees routinely violated or disregarded the inmates' medical needs. Additionally, there are no factual allegations establishing a widespread or routine practice in denial of medical care or emergent treatment of inmates to give any supervisor knowledge, either actual or constructive, of such a practice.

Moreover, Plaintiff has not alleged that Mayor Hellmich, Chief Bullock, Deputy Chief Carnley, Jail Cmdr. Dearing, or Chief Corrections Officer Phillips personally participated in the denial of medical care to Myers, nor has Plaintiff causally connected the actions of Mayor Hellmich, Chief Bullock, Deputy Chief Carnley, Jail Cmdr. Dearing, Chief Corrections Officer Phillips, Officer Gouveia, or Officer Williams to any unconstitutional conduct, much less harm to Myers. Cottone, 326 F.3d at 1360. Specifically, Plaintiff has not alleged facts plausibly showing a history of widespread abuse regarding inmates failing to receive medical care at the Foley City Jail. Beyond conclusory allegations, Plaintiff has not shown the existence of any custom or policy resulting in the denial or delay of medical care at the jail. Nor has Plaintiff alleged that any Supervisory Defendant directed any subordinate jail officer to act unlawfully or knew that the subordinate would act unlawfully and failed to stop them. For these reasons, Plaintiff has failed to overcome the rigorous standard of stating a supervisory liability claim, and all Supervisory Defendants are entitled to qualified immunity. See id.

**D. Section 1983 Municipal Liability Claims.**

Plaintiff alleges municipal liability claims against the City of Foley in Counts I, II, VII, VIII, IX, and XI, asserting the same allegations as brought against the supervisors. (Doc. 19 at ¶¶ 46-84, 113-29, 135-40). The Foley Defendants move to dismiss

the claims against the City of Foley because the Complaint does not state a constitutional violation, does not demonstrate an official custom or policy that constituted deliberate indifference to a constitutional right, and does not show the City of Foley acted with deliberate indifference or causation. (Doc. 25 at 48-52).

"The Supreme Court has placed strict limitations on municipal liability under section 1983." Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998). "Liability under § 1983 cannot be based on the theory of vicarious liability." Ireland, 53 F.4th at 1289. "Instead, municipal liability must be based on a governmental policy or custom." Davis v. City of Apopka, 78 F.4th 1326, 1352 n.7 (11th Cir. 2023). That is, for a municipality to be liable under § 1983, the entity itself must be a moving force behind the deprivation; a municipality cannot be held liable on a respondeat superior theory." Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691-95 (1978). The municipality itself must cause the constitutional violation at issue. Baxter v. Roberts, 54 F.4th 1241, 1269 (11th Cir. 2022). To make a case for Monell liability, Plaintiff must show: "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." McDowell, 392 F.3d at 1289 (citing City of Canton

v. Harris, 489 U.S. 378, 388 (1989)).  The Eleventh Circuit has identified at least three ways a plaintiff can do this: "(1) identifying an official policy; (2) identifying an unofficial custom or widespread practice that is so permanent and well settled as to constitute a custom and usage with the force of law; or (3) identifying a municipal official with final policymaking authority whose decision violated the plaintiff's constitutional rights." Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty., Fla., 48 F.4th 1222, 1229 (11th Cir. 2022).

The Complaint does not point to an official custom or policy. Instead, Plaintiff takes the route of alleging unofficial customs or policies of the City or a policymaker's underfunding, understaffing, negligent supervision and training, and failure to supervise and train subordinate officers resulting in inmates, like Myers, receiving inadequate medical care, delayed or denied emergency treatment. (See Doc. 19 at ¶¶ 51, 64, 114, 121, 126-29, 136-37).  Specifically, the Complaint alleges the jail officials conducted no intake medical screening, provided no access to prescribed medications, and allowed multi-hour gaps in required welfare checks.  (Id. at ¶¶ 25-34, 47-54, 72-79).  Plaintiff asserts this occurred because the City of Foley operated its jail without qualified medical personnel, without conducting intake medical screening or providing access to prescribed medications, and permitted prolonged gaps in welfare checks despite obvious

51

medical distress, and failed to train and supervise officers on screening, emergency escalation, medication access, and monitoring-practices alleged as longstanding and known to City policymakers. (Doc. 31 at 13-14).

Plaintiff's municipal liability claims fail against the City of Foley for the same reasons Plaintiff's supervisory liability claims fail. Plaintiff has failed to state a constitutional claim by an individual officer or supervisor, Land v. Sheriff of Jackson Cnty. Fla., 85 F.4th 1121, 1129 (11th Cir. 2023) ("A Monell claim is derivative of—and so requires—an *actual* constitutional violation by an officer.") (emphasis in original); the Complaint allegations (which can be broadly categorized as underfunding, inadequate training, and failure to supervise and/or train) against the City of Foley are vague and conclusory, Townsend v. Heard, 2016 U.S. Dist. LEXIS 17321, at *12, 2016 WL 557844, at *4 (N.D. Ala. Feb. 12, 2016) ("These conclusory legal conclusions are not entitled to an assumption of truth."), and Plaintiff does not demonstrate that the City of Foley had notice of a policy or custom that amounted to deliberate indifference.

As previously discussed, it is clearly established law that a jail or prison may not deny or delay an inmate's access to healthcare to save costs or increase profits. See Ancata, 769 F.2d at 704. However, under Counts I, II, IX, and XI, the Complaint does not adequate facts to "show a pervasive and sustained . . .

problem at the [jail] that could have been resolved by additional funding." Presley v. Smith, 2008 U.S. Dist. LEXIS 64241, at *21, 2008 WL 3911251, at *6 (S.D. Ala. Aug. 21, 2008). And Plaintiff does not allege "a persistent or wide-spread practice" or "that the alleged constitutional violation here was a 'highly predictable consequence' of [the alleged] failure to budget and adequately staff the Jail." Nichols, 616 F. Supp. 2d at 1344-45.

As to Count VIII, the Complaint claims of negligent supervision and training fail because they are conclusory, and "[n]egligent acts do not give rise to § 1983 liability." Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty., Fla., 956 F.2d 1112, 1121 n.8 (11th Cir. 1992).

As to Counts VII and XI, the Complaint alleges failure to supervise and train. (Doc. 19 at ¶¶ 114, 137). There are "limited circumstances" in which an allegation of failure to train or supervise can form the basis of § 1983 liability. Harris, 489 U.S. at 387. Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983. Id. at 389. So, where the policies on their face are constitutional, a plaintiff has to show the municipal action was taken with deliberate indifference to obvious or known consequences. Id. at 388. For example, where "a program does not

53

prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for." Board of County Com'rs of Bryan County, Okla. v. Brown, 520 U.S. 397, 407 (1997). Thereafter, "continued adherence to an approach that [decisionmakers] know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipality liability." Id.

Stated another way, to state a claim for municipal liability, "a pattern of similar constitutional violations by untrained employees . . . is typically necessary to demonstrate deliberate indifference for purposes of a failure to train claim." Kelly v. City of Bartow, 2025 U.S. Dist. LEXIS 119114, at *7, 2025 WL 1745144, at *3 (M.D. Fla. June 24, 2025) (citing Weiland v. Palm Beach Cnty. Sheriff's Off., 792 F.3d 1313, 1328 (11th Cir. 2015) (affirming dismissal of plaintiff's failure to train claim where plaintiff failed to allege a pattern of similar constitutional violations by untrained employees). Here, Plaintiff has not alleged nonenforcement of a policy or that the Foley City Jail's inadequate medical care or staff training resulted in constitutional violations in the past so as to put the City of Foley on notice of a need for correction. Based on the Complaint allegations, it was not "plainly obvious" that the policies, training, or customs of the Foley City Jail or the actions of its

officers were deficient because there are no other reported incidents linked to a policy or custom of non-enforcement of a policy or inadequate training in the areas of medical screening, providing medications, monitoring inmates, or providing medical attention.

Plaintiff cites to Hoefling v. City of Miami, 811 F.3d 1271, 1279 (11th Cir. 2016), to argue that he has plausibly alleged a claim against the City of Foley. (Doc. 31 at 14). That case, however, does not stand for the propositions Plaintiff expounds. Instead, Mr. Hoefling provided allegations of "other" examples of the city's conduct and identified state laws, regulations, and procedures that the city failed to follow with its policies and customs. Id. at 1280.

Moreover, as previously discussed, Plaintiff has not shown the violation of clearly established law under the facts of this case. "Municipalities cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established." Anderson ex rel. Anderson v. City of Minneapolis, 934 F.3d 876, 884 (8th Cir. 2019) (emphasis in original) (internal quotation marks and citation omitted); see also Wesby, 583 U.S. at 63 ("'Clearly established' means that, at the time of the . . . conduct, the law was 'sufficiently clear that every reasonable official would understand that what he is doing' is unlawful.") (quoting al-Kidd, 563 U.S. at 741).

**E. Leave to Amend.**

Plaintiff requests to amend the Complaint, in lieu of any dismissal, to cure any identified pleading deficiencies. (Doc. 31 at 18).

"Under the Federal Rules of Civil Procedure, a district court 'should freely give leave [to amend] when justice so requires.'" Oltmanns v. Int'l Longshoremen's Ass'n, 837 F. App'x 689, 694 (11th Cir. 2020) (quoting Fed. R. Civ. P. 15(a)(2)). "However, a court need not give leave "where amendment would be futile." Id. (quoting Corsello v. Lincare, Inc., 428 F.3d 1008, 1014 (11th Cir. 2005) (per curiam)). "Amendment is futile 'when the complaint as amended is still subject to dismissal because, for example, it fails to state a claim for relief.'" Id. (quoting Chang v. JPMorgan Chase Bank, N.A., 845 F.3d 1087, 1094 (11th Cir. 2017)). Since futility is a factor for the Court to consider, it "may deny leave to amend a complaint if it concludes that the proposed amendment would be futile, meaning that the amended complaint would not survive a motion to dismiss." Christman v. Walsh, 416 F. App'x 841, 844 (11th Cir. 2011) (per curiam); Cockrell v. Sparks, 510 F.3d 1307, 1310 (11th Cir. 2007). Thus, "[w]hen deciding whether the complaint as amended is still subject to dismissal, the usual motion to dismiss standard applies." Oltmanns, 837 F. App'x at 694; Hatcher v. Ala. Dep't of Human Servs., 747 F. App'x 778, 781 (11th Cir. 2018) (per curiam) ("'[A] district court may properly

deny leave to amend the complaint under Rule 15(a) when such amendment would be futile,' such as 'when the complaint as amended is still subject to dismissal' . . . .") (citations omitted).

Based on the clearly established law at the time the complaint arose, Plaintiff is unable to state a claim for deliberate indifference without demonstrating that Myers suffered symptoms that were observable and known to Defendants. Notably, Plaintiff asserts in response to this motion, though not in the Complaint, that Myers was booked into the Foley City Jail with "well-documented conditions - alcoholism, hypertension, and a heart condition – and displayed obvious symptoms visible to any layperson, including profuse sweating, chest pain, and tremors." (Doc. 31 at 3). If Plaintiff could demonstrate such symptoms, the outcome of his deliberate indifference claims might be curable. However, Plaintiff has not identified Myers exhibiting these symptoms on the jail video recordings put forth by Defendants in this motion. And after thoroughly reviewing the jail videos, the Court can find no symptoms to alert the Defendants to a serious medical need, such that deliberate indifference may be established. For this reason, amendment of the complaint would be futile and should be denied.

**F. State Law Claims.**

At to Counts III and IV, Plaintiff asserts state law claims of negligence and wantonness and wrongful death pursuant to Alabama

Code § 6-5-410. (Doc. 19 at ¶¶ 85-98). However, because dismissal
is due to be granted as to each of Plaintiff's federal (original
jurisdiction) claims against the Foley Defendants, the Court may
also decline to exercise supplemental jurisdiction over
Plaintiff's state law claims against the Foley Defendants.

As explained in Gill v. Wells Fargo Bank, N.A., 2016 U.S.
Dist. LEXIS 119870, *5-6, 2016 WL 4620372, *2 (S.D. Ala. Sept. 6,
2016):

> [T]he Eleventh Circuit "ha[s] encouraged district courts
> to dismiss any remaining state claims when . . . the
> federal claims have been dismissed prior to trial."
> Raney v. Allstate Ins. Co., 370 F.3d 1086, 1089 (11th
> Cir. 2004) (per curiam). See also United Mine Workers
> v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d
> 218 (1966) ("Needless decisions of state law should be
> avoided both as a matter of comity and to promote justice
> between the parties, by procuring for them a surer-
> footed reading of applicable law. Certainly, if the
> federal claims are dismissed before trial, even though
> not insubstantial in a jurisdictional sense, the state
> claims should be dismissed as well."); Mergens v.
> Dreyfoos, 166 F.3d 1114, 1119 (11th Cir. 1999) ("[T]his
> Court has noted that 'if the federal claims are dismissed
> prior to trial, Gibbs strongly encourages or even
> requires dismissal of state claims.'" (quoting L.A.
> Draper & Son v. Wheelabrator-Frye, Inc., 735 F.2d 414,
> 428 (11th Cir. 1984) (citing Gibbs, 383 U.S. at 726, 86
> S.Ct. 1130))); Dockens v. Dekalb Cnty. Sch. Sys., 441
> Fed.Appx. 704, 709 (11th Cir. 2011) (per curiam) ("Once
> the district court properly granted summary judgment for
> the School System on the FMLA claims, no federal claims
> remained. It was not abuse of discretion for the court
> to decline supplemental jurisdiction over the state law
> claim.").

See also e.g., Lowe v. Smith, 759 F. App'x 797, 809 (11th Cir. 2018) (per curiam) (affirming the lower court's dismissal without prejudice of the plaintiff's state law claims).

In keeping with the Eleventh Circuit's guidance, the Court should decline to exercise supplemental jurisdiction over Plaintiff's Alabama negligence and wantonness and wrongful death claims against the Foley Defendants, and thus, these claims (and any other remaining non-federal claims against the Foley Defendants) are due to be dismissed without prejudice.

### IV. CONCLUSION.

For the reasons explained above, the undersigned recommends that the Foley Defendants' motion to dismiss be **GRANTED in part** as to the federal claims brought against them pursuant to 42 U.S.C. § 1983, and that the Foley Defendants be granted qualified immunity on the asserted federal claims. It is further recommended that the Foley Defendants' motion to dismiss be **DENIED without prejudice** as to Plaintiff's remaining state law claims of negligence and wantonness and wrongful death, and that the Court decline to exercise supplemental jurisdiction over Plaintiff's state law claims against the Foley Defendants and dismiss those claims without prejudice.

### NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects

to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. GenLR 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1.

In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this **2nd** day of **March, 2026.**

**/s/ SONJA F. BIVINS**
**UNITED STATES MAGISTRATE JUDGE**